**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BDO USA, LLP,                                                  :

              Plaintiff,                         :        INDEX NO.

     v.                                                   :        **COMPLAINT**

MATTHEW FRANZ AND DONALD SOWELL,               :        **JURY TRIAL DEMANDED**

              Defendants.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff BDO USA, LLP ("BDO" or the "Firm"), by and through its undersigned counsel, for its complaint against defendants Matthew Franz ("Franz") and Donald Sowell ("Sowell"), alleges, on BDO's personal knowledge with respect to its own activities and on information and belief with respect to all other matters alleged, as follows:

## INTRODUCTION

1.      The defendants in this action, former employees of BDO who recently resigned, were faithless employees who, over an extended period of time, breached their employment agreements and circumvented Firm policies and procedures in order to develop and store valuable intellectual property that belongs to BDO on unauthorized personal laptops and outside servers. Through the date of this complaint, they have admitted to taking intellectual property that belongs to BDO and refused to return it. They have also refused to provide BDO with a complete and accurate accounting detailing where they hid BDO's intellectual property as well as who had and continues to have access to it. When confronted with recently uncovered information about their misconduct, and when offered the opportunity to help mitigate the damage they have caused to BDO, the defendants continued to attempt to hide their misconduct

1

and mislead BDO, and they have refused to help BDO retrieve and secure all copies of its intellectual property. The defendants' continued misconduct has necessitated the filing of this action, which seeks to hold them responsible for the monetary damage they have caused and are causing to BDO. Additionally, the defendants must provide BDO with a full accounting of the current and past whereabouts of the intellectual property that the defendants secreted from BDO's systems.

2.      This action arises from repeated breaches by Franz and Sowell of their employment agreements with BDO including the Manager Agreement dated November 6, 2015 between BDO and Franz (attached hereto as Exhibit A) and the Manager Agreement dated September 8, 2015 between BDO and Sowell (attached hereto as Exhibit B) (together the "Manager Agreements").

3.      As employees of BDO, Franz and Sowell were granted access to proprietary information and trade secrets of BDO ("BDO Confidential Information") and tasked with creating data analytics tools and solutions for the benefit of BDO ("BDO Work Product"). Franz and Sowell were contractually required to maintain BDO Confidential Information and BDO Work Product on BDO's computer systems, to not disclose such information and work product outside of BDO, and to turn over all BDO Work Product immediately upon its acquisition or origination to BDO. Franz and Sowell violated all of these obligations. While employed at BDO, Franz and Sowell developed and stored BDO Confidential Information and BDO Work Product—including relating to BioTRAK, a web-based dashboard for medical data concerning supply and demand of pharmaceuticals and their components, and USA Spend, a database of government contracting information searchable by means of a proprietary BDO methodology— on personal laptops not connected to BDO computer systems, on servers housed outside of

2

BDO's computer systems, and in email accounts outside of BDO, where such information and work product could not be monitored by BDO and where it could be copied, misappropriated, and passed on to others without being traced by BDO.

4.      The BDO Confidential Information and BDO Work Product that Franz and Sowell developed and stored outside of BDO's computer systems, which has been effectively lost to BDO, has already turned up on the website of a start-up consulting firm, EverGlade Consulting ("Everglade"), formed in May 2020 by Eric Jia-Sobota—a former BDO partner and Franz's and Sowell's former boss at BDO—who has embarked on a scheme to steal employees, clients, and business from BDO after he was passed over for promotion. Franz and Sowell have announced their resignations from BDO, and, notwithstanding the non-compete and non-solicitation provisions in the employment contracts of Franz, Sowell, and Jia-Sobota, have engaged in discussions with Jia-Sobota and EverGlade about potential employment opportunities in competition with BDO.

5.      As employees of BDO, Franz and Sowell were contractually required to devote all of their working time and energy exclusively to BDO. Franz and Sowell violated these obligations. Throughout their tenure as BDO employees, Frank and Sowell maintained separate competing consulting businesses outside of BDO, called DS Technical Consulting Company, and Integrated Compliance Analytics, Inc., respectively, through which they conducted personal business in competition with BDO while employed at BDO.

6.      As a result of Franz's and Sowell's wrongful conduct, BDO has suffered damages in excess of $500,000.

## PARTIES

7.    Plaintiff BDO is organized as a limited liability partnership under the laws of the State of Delaware. BDO is a national public accounting, tax, and advisory firm with offices in over 60 locations throughout the United States. BDO maintains offices in New York, NY at 100 Park Avenue, New York, NY 10017 and 622 Third Avenue, Suite 3100, New York, NY 10017.

8.    Franz is and at all relevant times was a citizen of the State of Washington. Franz is a former employee of BDO. He was the head of BDO's Data Analytics Team.

9.    Sowell is and at all relevant times was a citizen of the State of Texas. Sowell is a former employee of BDO. Sowell was a manager of the Data Analytics Team and reported directly to Franz.

## JURISDICTION AND VENUE

10.    Jurisdiction and venue in the Supreme Court of New York are proper because this dispute arises under the Manager Agreements, which provide that the "laws of the State of New York" shall apply to any action brought under the agreements and that "venue for any action or suit brought under [the] Agreement will be in any federal or state court of competent jurisdiction in New York County, New York." (Manager Agreements ¶ 18.)

## FACTS

**A.  BDO's Industry Specialized Services consulting practice**

11.    BDO provides assurance, tax, and financial advisory services to a multitude of clients operating in various industries and sectors throughout the world. BDO has 18 industry practices, including practices focused on Public Sector, Government Contracting, and Life Sciences.

12.     BDO's Industry Specialty Services Group (ISSG), formerly led by Jia-Sobota, encompasses a range of offerings in government contracting, life sciences, and in the nonprofit and higher education sectors.

13.     The ISSG government contracting team assists organizations that are pursuing or have already received a federal contract. The team consults with government contractors on a range of projects including dispute resolution, regulatory compliance, and transaction advisory services, as 'well as litigation, fraud, and forensic services. These services include bid protests, claims, contract terminations, prime-sub disputes and investigations.

14.     The ISSG life sciences team helps organizations accelerate research and development efforts. The team is split into a BioProcess Technology Group (BPTG) and Biodefense. The BPTG helps with product development while the Biodefense team helps companies find sources of non-dilutive research and development funding.

15.     The Data Analytics Team, formerly led by Franz, is a division of ISSG. The Data Analytics Team provides cross-functional support to ISSG practices on matters requiring the analysis and visualization of large datasets, preparation of complex analytical models, or development of custom web-based solutions, including a desktop application.

**B.  <u>The Manager Agreements with Franz and Sowell</u>**

16.     BDO hired Franz as a Manager pursuant to a Manager Agreement dated November 6, 2015. A true and correct copy of the Manager Agreement between BDO and Franz is attached hereto as Exhibit A.

17.     BDO hired Franz to perform data analytics and modeling to support BDO's ongoing data-driven projects, most of which concerned federal contracts.

18.     As head of the Data Analytics Team, Franz reported directly or indirectly to Jia-Sobota.

5

19.     BDO hired Sowell as a Manager pursuant to a Manager Agreement dated September 8, 2015. A true and correct copy of the Manager Agreement between BDO and Sowell is attached hereto as Exhibit B.

20.     The Manager Agreement with Franz (Exhibit A) and the Manager Agreement with Sowell (Exhibit B) contain substantially identical terms.

21.     Sowell's responsibilities included overseeing four members of the Data Analytics Team.

22.     Franz's responsibilities included supervising Sowell.

23.     Through their work as employees of BDO, Franz and Sowell gained access to, and became knowledgeable about, BDO, its business, its trade secrets, and its business relationships.

24.     The Manager Agreements provide that Franz and Sowell were hired by BDO as employees serving in Manager positions with such employment to be "at will" and terminable by either party at any time for any reason or no reason. (Manager Agreements ¶¶ 1-2.)

25.     Paragraph 2 of the Manager Agreements provided that "[w]hile employment continues," Franz and Sowell agreed "to devote all of [their] working time and energy and to give [their] best attention exclusively to the business of the Firm."

26.     Paragraph 3 of the Manager Agreements required Franz and Sowell to "adhere to and be bound by" the Firm's Workplace Guide (the "BDO Workplace Guide") and the BDO Code of Business Ethics and Conduct (the "BDO Code of Ethics").

27.     Paragraph 4 of the Manager Agreements contained the parties' agreement that "it is essential to protect the Firm and its clients from the unauthorized use or appropriation of confidential and proprietary information developed, held or used by the Firm concerning the

6

Firm or the Firm's clients ('Confidential Information')" and made clear that "[a]ll such Confidential Information is proprietary to the Firm."

28.     "Confidential Information" was defined in the Manager Agreements as follows:

> "Confidential Information" shall include, but not be limited to, the policies, practices, business, marketing and all other confidential and proprietary information of the Firm not generally known to the public, including (1) the identity of clients of the Firm and the identify of clients of firms with which the Firm has an Alliance relationship (the "Alliance Firms"), all information and knowledge concerning such clients such as names, addresses, tax identification numbers, trade secrets, audited and unaudited annual or interim financial statements, methods of keeping records, and information pertaining to fees billed to and paid by such clients; all records of accounting, auditing, tax and consulting services rendered to such clients, including workpapers, income tax returns, audit reports, reports or documents filed with any federal or state or local governmental or quasi-governmental body, or self-regulatory body; business and financial projections; the description and method of operations of such clients and information about their personnel; other accounting matters; any consultant reports or other reports evaluating or describing such clients' business or personnel in general or any particular aspect of the business; any correspondence or memoranda or reports concerning such clients; and any other document or report or writing or oral disclosure which includes important matters concerning the business or personal finances or history of such clients; (2) information relating to the Firm's personnel and any Alliance Firm's personnel; (3) information relating to the Firm's marketing efforts, including marketing plans, strategies, methodologies, database contents, and any and all information regarding current and prospective clients, including client lists and materials; and (4) the structure, organization, standards, strategies, practices, policies and processes of the Firm's Alliance Program, to the extent any such Confidential Information is not generally known to the public.

(Manager Agreements ¶ 4.)

29.     Paragraph 5 of the Manager Agreements required that Franz and Sowell "use, copy, and disclose Confidential Information only as necessary to conduct Firm business, as dictated by the Firm's policies, or as required and authorized by the Firm's agreements with its clients, Alliance Firms, licensors or vendors," and provided that Franz and Sowell were to return all Confidential Information in their possession upon departure from the Firm and to "not make or retain any copy or extract thereof."

7

30.     Paragraph 8 of the Manager Agreements, providing for $20,000 of damages upon

each instance of a violation of the agreements' confidentiality provisions, stated as follows:

> In consideration of the Firm appointing Employee to a Manager position and/or for continued employment with the Firm in a Manager position, it is agreed that prior to, at, or after, his/her departure from the Firm (whether by resignation, termination or otherwise):
>
> (a) If Employee, without the specific consent of the Chief Executive Officer, or his/her designee, removes, copies, uses or discloses any Confidential Information, including any files, business records, trade secrets or other property of the Firm, in contravention of the Employee's obligations under this Agreement, then Employee will pay the Firm $20,000 for any such incident, loss or damage, or a lesser amount, if Employee reasonably proves to the Firm that such lesser amount fully compensates the Firm for the applicable loss or damage;
>
> (b) If Employee, without the specific consent of the Chief Executive Officer, or his/her designee, otherwise causes the Firm financial loss or damage through unfair competition or business practices or violation of Employee's fiduciary duty, including the unauthorized use of Confidential Information, then the Employee shall pay the Firm $20,000 for any such incident, loss or damage, or a lesser amount, if Employee reasonably proves to the Firm that such amount reflects the applicable loss or damage.

31.     Paragraph 12(a) of the Manager Agreements, containing the obligation of Franz

and Sowell to turn over to BDO "immediately upon origination or acquisition" all intellectual

property, provided as follows (emphasis added):

> Employee agrees to disclose fully to the Firm, and assigns and transfers to the Firm ***immediately upon origination or acquisition*** thereof, the right, title, and interest, together with all intellectual property rights which may be granted thereon, in and to any and all inventions, discoveries, innovations, copyrights, trademarks, trade secrets, and or designs ("Work Product") made, discovered, developed, or secured by Employee (whether solely, jointly with others or otherwise):
>
>> (i)     during the period of his/her employment, If such Work Product is related, directly or indirectly, to the business of, or to the research or development work of the Firm; or
>>
>> (ii)    with the use of the time, materials, equipment, supplies or facilities of the Firm; or
>>
>> (iii)   within one (1) year after termination (whether by resignation, termination or otherwise) of Employee's employment, if such

8

Work Product is conceived as a result of or is attributable to work done during such employment and relates to the Firm's business, its methods, products, processes, or procedures or is within the scope of the business or administration of the Firm.

Employee agrees that all Work Product shall be the exclusive property of the Firm, whether or not patent applications are filed thereon, and Employee shall perform all acts and execute, at the Firm's request and at no expense to Employee, any and all papers and instruments the Firm considers reasonably necessary to perfect and protect the Firm's rights, title and interest in and to the Work Product covered above under this paragraph.

32.     All work produced during Franz's and Sowell's employment for BDO was "work for hire" and remains the exclusive property of BDO.

33.     Throughout their employment with BDO, Franz and Sowell owed and, as to certain matters, continue to owe, BDO fiduciary duties to act at all times with the utmost good faith, loyalty, and fair dealing towards BDO.

34.     The Manager Agreement provided that "if any dispute arises between the Firm and the Employee with respect to any matter that is the subject of this Agreement, the Firm, upon prevailing in such dispute, shall be entitled to recover from the Employee all of the Firm's associated costs and expenses, including its reasonable attorneys' fees, in addition to any and all other available remedies." (Manager Agreements ¶ 17.)

35.     The BDO Workplace Guide provided that "[a]ll Firm employees and partners are expected to comply with the policies set forth in the Workplace Guide, BDO's Code of Ethics and Business Conduct . . . and other Firm manuals," that "[s]upervisors have the added responsibility of setting an example by their actions and personal performance," and that "[e]ach supervisor should ensure that each employee and partner is aware of their individual responsibility."

9

Case 1:20-cv-06168-JPO   Document 1-1   Filed 08/06/20   Page 10 of 33

36.     Pursuant to Firm policy, Franz and Sowell were required, annually, to sign acknowledgements that they understood and agreed to comply with the BDO Workplace Guide and the BDO Code of Ethics.

37.     With respect to electronic communications, the BDO Code of Ethics clearly barred employees including Franz and Sowell from using non-Firm systems and services, providing as follows:

> All electronic communications pertaining to BDO business, clients and services are to be conducted using BDO's systems and not through the use of non-BDO systems and services, including but not limited to personal, outside e-mail accounts, smart device texting, personal instant messaging or Email applications, or social media accounts and services (e.g., Facebook, Twitter, Messenger, Google Mail). Furthermore, the forwarding, copying or syncing of BDO-related e-mail or client data to personal e-mail accounts or other data storage devices or cloud services, either individually or via a rule in the e-mail system, is prohibited. Mobile devices (e.g., cell phones, smart phones and tablets) may be used to access BDO communications in accordance with BDO's Mobile Devices policy in the Workplace Guide.

38.     The BDO Code of Ethics further provided that "[u]tilizing any non-sanctioned file sharing or transfer services to send or receive Confidential Information (e.g., Dropbox, Google Drive, One Drive (personal), etc.) is strictly prohibited," unless BDO staff has gone through "a formal process to request approval of one-way access to cloud services using BDO Service Now."

## C. Franz's and Sowell's obtaining, developing, and misusing of BDO Confidential Information and BDO Work Product

39.     As employees of BDO, Franz and Sowell were tasked with, among other projects, developing dashboards for BDO—information management tools that visually track, analyze, and display key data points in user-friendly, accessible, and customizable displays. BDO saw these dashboards as a profitable business opportunity that could be marketed through subscription-based services.

10

Case 1:20-cv-06168-JPO   Document 1-1   Filed 08/06/20   Page 11 of 33

40.     One of BDO's priorities was a product called BioTRAK, a web-based dashboard that analyzed medical data concerning the international supply and demand of pharmaceuticals and their components on a real-time basis.

41.     Another of BDO's priorities was the development of proprietary tools to search and categorize data from USA Spend, a publicly available government database that provides information about federal spending across the entire federal budget.

42.     The Data Analytics Team was also tasked with creating a similar tool to search and categorize data from other websites, such as a job posting site, to identify federal contractors in need of services that BDO's ISSG group could use for marketing efforts.

43.     In developing these dashboards and other work product for BDO, Franz and Sowell—in violation of their Manager Agreements, the BDO Workplace Guide, and the BDO Code of Conduct—developed and stored BDO Confidential Information and BDO Work Product on personal laptops that were not supplied to them by BDO and on servers maintained outside of BDO's computer systems, including on Amazon Web Services, Github, Google, Linode, Okta, and perhaps others.

44.     Franz and Sowell used non-BDO computers and servers to develop code and store data and information relating to BioTRAK and USA Spend.

45.     With Franz's knowledge, Sowell personally purchased several computers that resembled BDO-approved devices that Franz and Sowell, and others who worked for them, used to develop BDO Work Product.

46.     Sowell and Franz also stored BDO Work Product they were developing outside of BDO's network. Specifically, Sowell and Franz directed the Data Analytics Team to develop the website displaying the BioTRAK dashboard on Amazon Web Services, Github, and Linode.

47.     Similarly, Franz and Sowell communicated with other members of the Data Analytics Team outside of BDO's controlled email environment, including through gmail accounts.

48.     Franz and Sowell were well aware of the requirement to obtain approval through a Service Now request for their use of non-Firm laptops, servers, and email accounts, and yet they did all of these things without seeking or obtaining the required approvals. Sowell alone submitted over 50 Service Now requests during his tenure at BDO, evidencing his knowledge of the requirements, but none of those requests sought, or resulted in his obtaining, authorization for any of the conduct described herein.

49.     Sowell personally purchased the website that hosts BioTRAK, rather than going through proper channels to purchase the website in BDO's name.

**D.    BDO Confidential Information and BDO Work Product fall into the hands of Jia-Sobota and EverGlade**

50.     From on or around August 24, 2011 to April 8, 2020, Jia-Sobota served as the national leader of ISSG with responsibility for oversight and management of the group.

51.     In mid-2019, BDO began expanding its Public Sector Practice, including by bolstering the existing service offerings.

52.     Jia-Sobota wanted to lead the Public Sector Practice and lobbied to have the practice integrated into ISSG.

53.     BDO chose to leave BDO's Public Sector Practice as its own standalone entity and did not select Jia-Sobota to lead that entity.

54.     In or around February 2020, Jia-Sobota founded A2Z Associates, Inc.

55.     On or around April 14, 2020, A2Z Associates, Inc. filed applications with the U.S. Patent and Trademark Office to register a series of trademarks using the name, "EverGlade."

56.     A2Z Associates, Inc. is conducting business as "EverGlade Consulting."

57.     On or around May 5, 2020, Jia-Sobota publicly launched EverGlade in direct competition with BDO.

58.     Despite being a fledgling consulting company, EverGlade advertises that it markets and sells many of the same products used and developed by BDO's ISSG, including those developed by the Data Analytics Team.

59.     For example, BDO's website describes BDO's capabilities with respect to commercial contracting, contract management, and compliance, including meeting "the unique needs of GSA and VA Federal Supply Schedule contracts," "leverage[ing] data analytics knowledge and tools to help our clients stay, strategically within the federal pricing statutory and regulatory structure," and providing audit support using "a proprietary global audit methodology." https://www.bdo.com/industries/governmentcontracting/ commercial-products (last visited May 24, 2020).

60.     On its website, EverGlade similarly holds itself out as providing "GSA./Commercial Contracting Solutions" by providing "GSA Schedule Proposal Support," "Contract Administration," "Audit Support," and "Historical Pricing Analysis." https://www.evergladeconsulting.com/evergladefederal/ (last visited May 24, 2020).

61.     In a launch video touting EverGlade's capabilities, Jia-Sobota describes products that it purports to offer to clients that bear a striking resemblance to the BDO Work Product developed by Franz and Sowell, including BioTRAK and USA Spend.

13

Case 1:20-cv-06168-JPO   Document 1-1   Filed 08/06/20   Page 14 of 33

62.     EverGlade and Jia-Sobota, who was a partner at BDO from August 2011 until recently, could not have access to product offerings such as BioTrak and USA Spend from any source other than from BDO Work Product developed by Franz and Sowell and the teams that worked for them at BDO.

63.     While employees of BDO, Franz and Sowell have both been in contact with Jia-Sobota and EverGlade about potential employment opportunities or other business dealings in competition with BDO.

**E.      While employed at BDO, Franz and Sowell pursue personal consulting business in competition with BDO**

64.     Despite promising that they would "devote all of [their] working time and energy and to give [their] best attention exclusively to the business of the Firm," both Franz and Sowell have devoted time, energy, and attention to their own personal business projects while employed at BDO.

65.     Franz owns and operates Integrated Compliance Analytics, a Delaware corporation with a registered address at 2534 12th Ave W, Seattle, WA 98119.

66.     Sowell owns and operates his own technology consulting firm, DS Technical Consulting Company, a Texas corporation, with a registered address at 9135 FM 561, De Kalb, TX, 75559.

67.     Franz and Sowell continued to conduct personal business through these companies, in competition with BDO, after becoming employees of BDO.

**F.      Franz's and Sowell's resignations**

68.     On June 9, 2020, Franz tendered his resignation to BDO, which was effective June 26, 2020.

69.     On June 11, 2020, Sowell tendered his resignation to BDO, which was effective June 30, 2020.

## FIRST COUNT
### (Breach of Contract)

70.     BDO repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     Franz and Sowell voluntarily entered into Manager Agreements with BDO.

72.     The Manager Agreements are valid, binding, and enforceable contracts.

73.     BDO performed all of its obligations pursuant to the terms of the Manager Agreements.

74.     Franz and Sowell breached their obligations under the Manager Agreements, including by (a) repeatedly removing, copying, using, and disclosing to third parties BDO Confidential Information and BDO Work Product; (b) loading onto and developing BDO Confidential Information and BDO Work Product on non-Firm laptops; (c) loading onto and developing BDO Confidential Information and BDO Work Product on non-Firm servers; (d) using non-Firm e-mail accounts to conduct BDO business; and (e) failing to turn over to BDO immediately upon origination or acquisition intellectual property developed for BDO.

75.     Franz and Sowell further breached the Manager Agreements by failing to devote all of their working time and energy and to give their best attention exclusively to the business of the Firm, including by (a) maintaining separate personal consulting businesses that competed with BDO and (b) devoting time and energy and attention to those separate businesses while employed at BDO.

76.     Franz's and Sowell's breaches of their respective Manager Agreements resulted in damages to BDO in excess of $500,000.

15

Case 1:20-cv-06168-JPO   Document 1-1   Filed 08/06/20   Page 16 of 33

## SECOND COUNT
### (Breach of Fiduciary Duty)

77.     BDO repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     Franz and Sowell each owed BDO a fiduciary duty in their capacities as managing directors of BDO.

79.     Franz and Sowell breached their fiduciary duty to BDO by acting against BDO's interests during their tenure as Managers at BDO.

80.     By breaching their fiduciary duties to BDO, Franz and Sowell have directly caused damage to BDO in an amount to be determined at trial.

## THIRD COUNT
### (Breach of Duty of Good Faith and Fair Dealing)

81.     BDO repeats and realleges each and every allegation contained above as if fully set forth herein.

82.     Under New York law, which governs the Manager Agreements, every contract contains an implied covenant of good faith and fair dealing.

83.     Franz and Sowell have acted without justification and in bad faith in failing to perform their obligations under the Manager Agreements.

84.     Franz's and Sowell's conduct has deprived BDO of the benefits the parties agreed upon in their respective Manager Agreements, and constitutes a breach of their duty of good faith and fair dealing under the Manager Agreements.

85.     Franz's and Sowell's breach of their duty of good faith and fair dealing has caused damages to BDO in an amount to be proven at trial.

16

## FOURTH COUNT
### (Faithless Servant)

86.     BDO repeats and realleges each and every allegation contained above as if fully set forth herein.

87.     Franz and Sowell owed BDO a duty of loyalty.

88.     Franz and Sowell engaged in repeated acts of disloyalty to BDO.

89.     Franz and Sowell intentionally violated their employment agreements with BDO as well as BDO policies designed to protect the Firm and its business and reputation.

90.     The nature of the violations (including the disclosure and misuse of BDO Confidential Information and BDO Work Product, the secretion of Firm property to locations outside of BDO, the continued pursuit of personal business in competition with the Firm), the repetition of the violations over time, and the fact that the violations were deliberate and intentional demonstrate that Franz and Sowell had no intention of complying with, and did not comply with, their fiduciary obligations of loyalty to BDO.

91.     Under the faithless servant doctrine, Franz and Sowell are not entitled to retain any of the compensation and bonuses they received while employed at BDO.

## FIFTH COUNT
### (Unjust Enrichment)

92.     BDO repeats and realleges each and every allegation contained above as if fully set forth herein.

93.     As a result of their misconduct, Franz and Sowell received compensation and/or benefits from BDO to which they were not entitled.

94.     BDO did not receive consideration for Franz's and Sowell's unlawful receipt of the aforementioned benefits.

95.     It is against equity and good conscience to permit Franz and Sowell to retain compensation and/or benefits exceeding that which they were entitled.

### PRAYER FOR RELIEF

**WHEREFORE**, BDO respectfully prays for judgment in favor of plaintiff and against the defendants as follows:

1. Damages in an amount to be determined at trial, but no less than $500,000;

2. Specific performance of the defendants' contractual obligations to BDO, including (a) the return of all of BDO's intellectual property to BDO; (b) a full accounting for the past and present whereabouts of all copies of BDO's intellectual property that the defendants created, stored, maintained, or moved to non-BDO servers, computers, laptops, e-mail accounts, and other locations; (c) the defendants' discontinued use of, and access to, plaintiff's computer files, data, emails, contacts, and valuable, confidential and proprietary information, including computer software and code developed by defendants while employed by plaintiff;

3. Attorneys' fees, interest, and costs;

4. Pre-judgment and post-judgment interest; and

5. Any other relief that this Court deems just and proper.

18

Case 1:20-cv-06168-JPO   Document 1-1   Filed 08/06/20   Page 19 of 33

Dated: June 30, 2020                    Respectfully submitted,

                                        **McDermott Will & Emery LLP**

                                        By:      /s/ *Gregory G. Ballard*

                                                 Gregory G. Ballard
                                                 M. Elias Berman
                                                 340 Madison Avenue
                                                 New York, NY 10173
                                                 Tel: (212) 547-5400
                                                 Fax: (212) 547-5444
                                                 gballard@mwe.com
                                                 eberman@mwe.com

                                                 Michael J. Sheehan
                                                 444 West Lake Street
                                                 Suite 4000
                                                 Chicago, IL 60606
                                                 Tel: (312) 372-2000
                                                 Fax: (312) 984-7700
                                                 msheehan@mwe.com

                                                 *Attorneys for BDO USA, LLP*

Exhibit A

# BDO USA, LLP
# MANAGER AGREEMENT

BDO USA, LLP, a limited liability partnership organized under the laws of the State of Delaware (the "Firm" or "BDO"), desires to employ or continue to employ the undersigned individual ("Employee") and to have said Employee serve in a Manager position, with the special considerations such status entails, including Employee's initial compensation, increase in compensation, and/or promotion, and the Employee desires to serve in that capacity. The Manager positions are non-partner positions that include but are not limited to, managers, senior managers, directors, senior directors, managing directors and/or positions associated with the levels 6 through 9 within the Firm's personnel administration system.

In consideration of the foregoing, and the other terms and conditions herein contained, Employee and BDO (the "Parties") hereby agree as follows:

1.      Employee shall be employed by the Firm in a Manager position.

2.      Employee's employment under this Agreement shall be or continue to be "at will" and either party may terminate that employment at any time, with or without notice, for any reason whatsoever or no reason. Employee acknowledges and agrees that this Agreement does not constitute a commitment to employment or any position for any specific duration. While employment continues, Employee agrees to devote all of Employee's working time and energy and to give Employee's best attention exclusively to the business of the Firm.

3.      Other than as set forth herein, Employee agrees to adhere to and be bound by the Firm's Workplace Guide and the BDO Code of Business Ethics and Conduct, as either or both may be revised from time to time, and the applicable policies, procedures, rules and requirements of the Firm, as implemented from time to time.

4.      It is agreed that it is essential to protect the Firm and its clients from the unauthorized use or appropriation of confidential and proprietary information developed, held or used by the Firm concerning the Firm or the Firm's clients ("Confidential Information"). When used hereinafter, the term "Confidential Information" shall include, but not be limited to, the policies, practices, business, marketing and all other confidential and proprietary information of the Firm not generally known to the public, including (1) the identity of clients of the Firm and the identity of clients of firms with which the Firm has an Alliance relationship (the "Alliance Firms"), all information and knowledge concerning such clients such as names, addresses, tax identification numbers, trade secrets, audited and unaudited annual or interim financial statements, methods of keeping records, and information pertaining to fees billed to and paid by such clients; all records of accounting, auditing, tax and consulting services rendered to such clients, including workpapers, income tax returns, audit reports, reports or documents filed with any federal or state or local governmental or quasi-governmental body, or self-regulatory body; business and financial projections; the description and method of operations of such clients and information about their personnel; other accounting matters; any consultant reports or other reports evaluating or describing such clients' business or personnel in general or any particular aspect of the business; any correspondence or memoranda or reports concerning such clients; and any other document or report or writing or oral disclosure which includes important matters concerning the business or personal finances or history of such clients; (2) information relating to the Firm's personnel and any Alliance Firm's personnel; (3) information relating to the Firm's marketing efforts, including marketing plans, strategies, methodologies, database contents, and any and all information regarding current and prospective clients, including client lists and materials; and (4) the structure, organization, standards, strategies, practices, policies and processes of the Firm's Alliance Program, to the extent any such Confidential Information is not generally known to the public. All such Confidential Information is proprietary to the Firm.

5.      (a) Employee agrees that during his/her employment, he/she will use, copy and disclose Confidential Information only as necessary to conduct Firm business, as dictated by the Firm's policies, or as required and authorized by the Firm's agreements with its clients, Alliance Firms, licensors or vendors. Upon Employee's departure from the Firm (whether by resignation, termination or otherwise) and prior to departure, Employee shall deliver to the Firm all Confidential Information in Employee's possession, custody or control, whether maintained electronically or otherwise, including any and all records, documents, and files containing such Confidential Information, as well as all other property of the Firm, and shall not make or retain any copy or extract thereof.

INDEX NO. 652816/2020
RECEIVED NYSCEF: 06/30/2020

Employee agrees that after his/her employment, he/she will *not*, without the specific *consent* of the Chief Executive Officer, or his designee, use or disclose any Confidential Information. If Employee is asked to disclose Confidential Information by subpoena or other legal process, Employee agrees to seek the consent of the Firm through the Office of the General Counsel, prior to making such disclosure.

(b) Employee understands that nothing in this Manager Agreement prohibits Employee from reporting possible violations of Federal law or regulation to any Federal agency or entity, *including*, but not limited to, the Department of Justice, the Securities and Exchange Commission, the Congress, and *any agency Inspector* General, or making other disclosures that are protected under any whistleblower statutes or regulations. Employee understands that he/she does not need prior authorization of the Chief Executive Officer or Office of the General Counsel to make such reports and is not obligated to notify the Chief Executive Officer or Office of the General Counsel that such reports have been made.

6.    It is understood, acknowledged and agreed that Employee has a fiduciary relationship with the Firm because of all the Confidential Information obtained or to be obtained concerning the Firm and its clients. It is also understood, acknowledged and agreed that if Employee left the employ of the Firm, Employee would be in an advantageous position, because of the Confidential Information known to Employee and/or the relationships Employee has developed with the Firm's clients and prospective clients, to obtain, or assist in obtaining, the business of, and to serve, the Firm's clients or prospective clients; and it is agreed that such use of Confidential Information or such relationships to obtain the business of the Firm's clients or prospective clients would be a breach of the Employee's fiduciary responsibilities to the Firm as well as of this Agreement, prejudicial to the conduct of the Firm's practice, and adverse to its interests.

7.    In consideration of the Firm appointing Employee to a Manager position and/or for continued employment with the Firm in a Manager position, it is agreed that prior to, at, or within eighteen (18) months after, his/her departure from the Firm (whether by resignation, termination or otherwise):

(a) If, without the specific consent of the Chief Executive Officer, or his/her designee, Employee performs by himself/herself, or through an entity with which he/she is or becomes associated, or arranges for such entity to perform, engagements involving accounting, auditing, tax or consulting services, or any related services, for a client with whom Employee developed a relationship which the Firm enabled him/her to acquire through his/her performance of direct and substantive services, or as to whom Employee has Confidential Information obtained through the Firm, or causes a client or prospective client of the Firm to terminate its relationship with the Firm through unfair competition or business practices, including through the unauthorized use of Confidential Information, then Employee will compensate the Firm for the loss and damages suffered by the Firm by reason of lost engagement(s) by paying liquidated damages in an amount equal to the greater of -EITHER- (i) (A) one and one-half times the fees charged for such engagement(s) by the Firm for services performed by the Firm either (1) during the last full fiscal year or (2) the 12 month period prior to the last date upon which the Firm performed services for the client which the Firm loses as a result of such breach, whichever is greater, or (B) in the case of a prospective client or a prospective engagement, one and one-half times the amount of the proposed fee for the next 12 months of such lost engagement(s) -OR- (ii) one and one-half times the amount of the fee paid for such lost engagement(s) in the 12 month period following Employee's departure from the Firm.  For purposes of this Paragraph 7(a), a prospective client is any person, company, partnership or other entity to which the Firm has made an oral or written proposal to perform services.

Employee agrees to disclose in writing to his/her former Office Managing Partner or National Director, as applicable, within eighteen (18) months after the last date of Employee's employment with the Firm, all engagements involving accounting, auditing, tax or consulting services, or any related services performed within eighteen (18) months after his/her departure from the Firm, whether performed by Employee by himself or herself, and/or through an entity with which he/she is or becomes associated, and/or which Employee arranged for such an entity to perform, which resulted, in whole or in part, from Employee's prior employment by the Firm.

(b) If Employee, without the specific consent of the Chief Executive Officer, or his/her designee, solicits or otherwise causes another employee to leave the Firm through unfair competition or business practices or in violation of Employee's fiduciary duty, including the unauthorized use of Confidential Information, or to perform engagements involving accounting, auditing, tax and/or consulting services for any other firm, person or entity,

2

INDEX NO.

RECEIVED NYSCEF

then Employee will pay the Firm an amount equal to the total of (I) twenty-five percent (25%) of the Annual Earnings of the departing employee, to cover the costs of replacing the departing employee; and (II) an additional ten percent (10%) of the departing employee's Annual Earnings for each year of service of the departing employee, up to a maximum of fifty percent (50%) of the departing employee's Annual Earnings, to cover training costs. For purposes of this Paragraph 7(b), the term "Annual Earnings" means the total dollars received as wages (excluding any bonus) by the departing employee during the twelve months preceding the last date of employment.

8.    In consideration of the Firm appointing Employee to a Manager position and/or for continued employment with the Firm in a Manager position, it is agreed that prior to, at, or after, his/her departure from the Firm (whether by resignation, termination or otherwise):

(a)  If Employee, without the specific consent of the Chief Executive Officer, or his/her designee, removes, copies, uses or discloses any Confidential Information, including any files, business records, trade secrets or other property of the Firm, in contravention of the Employee's obligations under this Agreement, then Employee will pay the Firm $20,000 for any such incident, loss or damage, or a lesser amount, if Employee reasonably proves to the Firm that such lesser amount fully compensates the Firm for the applicable loss or damage;

(b)  If Employee, without the specific consent of the Chief Executive Officer, or his/her designee, otherwise causes the Firm financial loss or damage through unfair competition or business practices or violation of Employee's fiduciary duty, including the unauthorized use of Confidential Information, then the Employee shall pay the Firm $20,000 for any such incident, loss or damage, or a lesser amount, if Employee reasonably proves to the Firm that such amount reflects the applicable loss or damage.

9.    It is agreed that Employee will pay to the Firm any amounts owing under paragraphs 7 or 8 with interest at the prime rate as charged from time to time by the principal bank(s) used by the Firm at such times, in five equal annual installments commencing thirty days from the date of notice from the Chief Executive Officer, or his/her designee, with succeeding payments to be made on the anniversary of such notice. If Employee performs by himself/herself, or through an entity, or arranges for the performance of, services for a client or prospective client of the Firm, as set forth in paragraph 7(a) above, Employee agrees to maintain as confidential any Confidential Information known to Employee concerning such client, former client or prospective client in accordance with paragraphs 4 and 5 above.

10.  Notwithstanding anything contained in paragraphs 7 through 9 of this Agreement, it is agreed that any breach or threatened breach by the Employee of any of the covenants of paragraphs 7 or 8 may result in irreparable injury and damage to the Firm, which irreparable injury and damage shall not be adequately compensated in money damages, that the Firm shall have no adequate remedy at law for any such breach, and that, in addition to the Parties' agreements in paragraphs 7 and 8 as to amounts owing upon such breach by Employee, the Firm shall also be entitled to such equitable relief as may be necessary to protect it against any such breach or threatened breach, including, without limitation, injunctive relief.  It is further agreed that the Parties' agreements in paragraphs 7 and 8 as to amounts owing upon Employee's breach of any of the covenants of paragraph 7 or 8 are not intended to be in lieu of the injunctive relief in this paragraph and that it is fair and reasonable that the Firm be entitled to both remedies in the event of any one breach.

11.  (a)   Employee agrees to notify the Assurance Regional Technical Director for his/her office of any conversations, while employed by the Firm, with any of the Firm's attest clients regarding possible employment. It is understood and agreed that this notice is required so that the Firm may take steps toward effectively eliminating the risk that, by reason of Employee's knowledge of and relationships with the Firm, Employee could adversely influence the quality or effectiveness of an engagement for which independence is required.

(b)  Notwithstanding the obligations set forth in paragraph 11(a), Employee further agrees that he/she will not take a position in a financial reporting oversight role (as defined in Rule 2-01(f)(3)(ii) of SEC Regulation S-X; such positions include, but are not limited to: a member of the board of directors, chief executive officer, chief financial officer, chief operating officer, chief accounting officer, controller, director of internal audit, director of financial reporting, treasurer, or any equivalent position) at a publicly-held entity that is an audit client of the Firm at that time, if doing so would cause BDO to become not independent of that entity pursuant to Rule 2-01(c)(2)(iii)

3

RECEIVED NYSCEF: 06/30/2020

of SEC Regulation S-X. (This could occur if the employee was a member of the audit engagement team of that entity during the one (1) year period preceding the date that audit procedures commenced for the fiscal period that includes the date of initial employment of the Employee by the audit client, as proscribed by that rule. To comply with this rule, the entity must have filed with the SEC one annual report for a period subsequent to the period covered by the audit for which the Employee was a member of the audit engagement team.) This prohibition will remain in effect after the Employee has left the Firm (whether by resignation, termination, or otherwise) for the duration of the prohibited period. Employee agrees to discuss with the Assurance Regional Technical Director for his/her current or former BDO office any position that may come within the restriction of this subparagraph 11(b). It is understood and agreed that this restriction is required for BDO to comply with the rules of the Securities and Exchange Commission and that, should Employee fail to comply with this restriction and if this would cause BDO to become not independent, BDO would be prohibited from further providing attest services to such client and consequently would suffer significant and irreparable injury.

12. (a) Employee agrees to disclose fully to the Firm, and assigns and transfers to the Firm immediately upon origination or acquisition thereof, the right, title, and interest, together with all intellectual property rights which may be granted thereon, in and to any and all inventions, discoveries, improvements, innovations, copyrights, trademarks, trade secrets, and or designs ("Work Product") made, discovered, developed, or secured by Employee (whether solely, jointly with others or otherwise):

(i) during the period of his/her employment, if such Work Product is related, directly or indirectly, to the business of, or to the research or development work of the Firm; or

(ii) with the use of the time, materials, equipment, supplies or facilities of the Firm; or

(iii) within one (1) year after termination (whether by resignation, termination or otherwise) of Employee's employment, if such Work Product is conceived as a result of or is attributable to work done during such employment and relates to the Firm's business, its methods, products, processes, or procedures or is within the scope of the business or administration of the Firm.

Employee agrees that all Work Product shall be the exclusive property of the Firm, whether or not patent applications are filed thereon, and Employee shall perform all acts and execute, at the Firm's request and at no expense to Employee, any and all papers and instruments the Firm considers reasonably necessary to perfect and protect the Firm's rights, title and interest in and to the Work Product covered above under this paragraph.

(b) Paragraph 12(a) shall not apply to any of Employee's rights in any invention (1) for which no equipment, supplies, facilities or trade secret information of the Firm was used, and (2) that was developed entirely on Employee's own time unless (i) the invention relates (A) to the business of the Firm, or (B) to the Firm's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Firm.

(c) Employee acknowledges that he/she has carefully read these provisions and agrees that the restrictions and obligations set forth herein are fair and reasonable and are reasonably required for the protection of the interests of the Firm, its partners and employees.

13. (a) Employee agrees that the Firm may make reasonable use of Employee's name, portrait or photograph for advertising and trade purposes.

(b) Employee agrees that employment by and the compensation routinely received therefore from the Firm shall be full consideration and compensation for services performed by Employee and for the Work Product assigned by Employee to the Firm hereunder. Employee further understands that the amount and/or nature of compensation routinely received by Employee from the Firm may be changed from time to time without affecting any provision of this Agreement.

14. None of the provisions of this Agreement shall be considered amended or waived by either party unless such amendment or waiver is made in writing by the persons executing this Agreement, or by other duly authorized agents or representatives of the Parties. To the extent permissible by applicable laws, the Firm may assign or otherwise transfer all of its rights and obligations of this Agreement, or any part of this Agreement, at any time in its sole discretion.

4

FILED: NEW YORK COUNTY CLERK 06/30/2020 04:59 PM
NYSCEF DOC. NO. 3

INDEX NO. 652810/2020
RECEIVED NYSCEF: 06/30/2020

15. This Agreement constitutes the entire agreement between the Parties hereto and cancels and supersedes, as of the date hereof, any and all other previous agreements between the Parties as to the subject matter of the Agreement. The terms of this Agreement shall survive the departure of the Employee from the Firm and any change in Employee's position with the Firm, including election to partnership, except to the extent any such terms are rendered meaningless or expressly superseded by further written agreement(s) between Employee and the Firm.

16. In the event any provision of this Agreement is found to be void, illegal or invalid for any reason whatsoever, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable. In any event, the unenforceability or invalidity of any provision of this Agreement shall not affect any other provision of this Agreement, and this Agreement will continue in full force and effect, and be construed and enforced, as if such provision had not been included, had been deleted, or had been modified as above provided, as the case may be, it being the intention of the Parties that this Agreement be interpreted and construed so as to render it enforceable.

17. It is agreed that any Firm dispute resolution procedure that may be or may become effective during the term of this Agreement shall in no way preclude or limit the right of the Employee or the Firm to seek any remedy available at law or in equity, and/or to file an action or suit in any court of competent jurisdiction with respect to any dispute arising under the provisions of Paragraphs 3 through 13 of this Agreement, subject to the limitations set forth in Paragraph 18 below. It is further agreed that if any dispute arises between the Firm and the Employee with respect to any matter that is the subject of this Agreement, the Firm, upon prevailing in such dispute, shall be entitled to recover from the Employee all of the Firm's associated costs and expenses, including its reasonable attorneys' fees, in addition to any and all other available remedies.

**18. Employee hereby agrees that the laws of the State of New York, excluding the conflicts of law provisions, shall apply to any action brought under this Agreement; agrees that venue for any action or suit brought under this Agreement will be in any federal or state court of competent jurisdiction in New York County, New York; and agrees to accept process in any such action.**

By Employee's signature below, Employee acknowledges that he/she has read, fully understands and agrees to the terms of this Agreement.

EMPLOYEE

Signature

Print Name: Matthew Franz

Date: 11/6/15

Acknowledged and Agreed by:

Signature of Authorized Partner of the Firm

*ManagerAgrmt 0915 (US)*

5

# Exhibit B

# BDO USA, LLP
# MANAGER AGREEMENT

BDO USA, LLP, a limited liability partnership organized under the laws of the State of Delaware (the "Firm" or "BDO"), desires to employ or continue to employ the undersigned individual ("Employee") and to have said Employee serve in a Manager position, with the special considerations such status entails, including Employee's initial compensation, increase in compensation, and/or promotion, and the Employee desires to serve in that capacity. The Manager positions are non-partner positions that include but are not limited to, managers, senior managers, directors, senior directors, managing directors and/or positions associated with the levels 6 through 9 within the Firm's personnel administration system.

In consideration of the foregoing, and the other terms and conditions herein contained, Employee and BDO (the "Parties") hereby agree as follows:

1.  Employee shall be employed by the Firm in a Manager position.

2.  Employee's employment under this Agreement shall be or continue to be "at will" and either party may terminate that employment at any time, with or without notice, for any reason whatsoever or no reason. Employee acknowledges and agrees that this Agreement does not constitute a commitment to employment or any position for any specific duration. While employment continues, Employee agrees to devote all of Employee's working time and energy and to give Employee's best attention exclusively to the business of the Firm.

3.  Other than as set forth herein, Employee agrees to adhere to and be bound by the Firm's Workplace Guide and the BDO Code of Business Ethics and Conduct, as either or both may be revised from time to time, and the applicable policies, procedures, rules and requirements of the Firm, as implemented from time to time.

4.  It is agreed that it is essential to protect the Firm and its clients from the unauthorized use or appropriation of confidential and proprietary information developed, held or used by the Firm concerning the Firm or the Firm's clients ("Confidential Information"). When used hereinafter, the term "Confidential Information" shall include, but not be limited to, the policies, practices, business, marketing and all other confidential and proprietary information of the Firm not generally known to the public, including (1) the identity of clients of the Firm and the identity of clients of firms with which the Firm has an Alliance relationship (the "Alliance Firms"), all information and knowledge concerning such clients such as names, addresses, tax identification numbers, trade secrets, audited and unaudited annual or interim financial statements, methods of keeping records, and information pertaining to fees billed to and paid by such clients; all records of accounting, auditing, tax and consulting services rendered to such clients, including workpapers, income tax returns, audit reports, reports or documents filed with any federal or state or local governmental or quasi-governmental body, or self-regulatory body; business and financial projections; the description and method of operations of such clients and information about their personnel; other accounting matters; any consultant reports or other reports evaluating or describing such clients' business or personnel in general or any particular aspect of the business; any correspondence or memoranda or reports concerning such clients; and any other document or report or writing or oral disclosure which includes important matters concerning the business or personal finances or history of such clients; (2) information relating to the Firm's personnel and any Alliance Firm's personnel; (3) information relating to the Firm's marketing efforts, including marketing plans, strategies, methodologies, database contents, and any and all information regarding current and prospective clients, including client lists and materials; and (4) the structure, organization, standards, strategies, practices, policies and processes of the Firm's Alliance Program, to the extent any such Confidential Information is not generally known to the public. All such Confidential Information is proprietary to the Firm.

5.  Employee agrees that during his/her employment, he/she will use, copy and disclose Confidential Information only as necessary to conduct Firm business, as dictated by the Firm's policies, or as required and authorized by the Firm's agreements with its clients, Alliance Firms, licensors or vendors.

Upon Employee's departure from the Firm (whether by resignation, termination or otherwise) and prior to departure, Employee shall deliver to the Firm all Confidential Information in Employee's possession, custody or control, whether maintained electronically or otherwise, including any and all records, documents, and files containing such Confidential Information, as well as all other property of the Firm, and shall not make or retain any copy or extract thereof. Employee agrees that after his/her employment, he/she will not, without the specific consent of the Chief Executive Officer, or his designee, use or disclose any Confidential Information. If Employee is asked to disclose Confidential Information by subpoena or other legal process, Employee agrees to seek the consent of the Firm through the Office of the General Counsel, prior to making such disclosure.

6.    It is understood, acknowledged and agreed that Employee has a fiduciary relationship with the Firm because of all the Confidential Information obtained or to be obtained concerning the Firm and its clients. It is also understood, acknowledged and agreed that if Employee left the employ of the Firm, Employee would be in an advantageous position, because of the Confidential Information known to Employee and/or the relationships Employee has developed with the Firm's clients and prospective clients, to obtain, or assist in obtaining, the business of, and to serve, the Firm's clients or prospective clients; and it is agreed that such use of Confidential Information or such relationships to obtain the business of the Firm's clients or prospective clients would be a breach of the Employee's fiduciary responsibilities to the Firm as well as of this Agreement, prejudicial to the conduct of the Firm's practice, and adverse to its interests.

7.    In consideration of the Firm appointing Employee to a Manager position and/or for continued employment with the Firm in a Manager position, it is agreed that prior to, at, or within eighteen (18) months after, his/her departure from the Firm (whether by resignation, termination or otherwise):

(a)   If, without the specific consent of the Chief Executive Officer, or his/her designee, Employee performs by himself/herself, or through an entity with which he/she is or becomes associated, or arranges for such entity to perform, engagements involving accounting, auditing, tax or consulting services, or any related services, for a client with whom Employee developed a relationship which the Firm enabled him/her to acquire through his/her performance of direct and substantive services, or as to whom Employee has Confidential Information obtained through the Firm, or causes a client or prospective client of the Firm to terminate its relationship with the Firm through unfair competition or business practices, including through the unauthorized use of Confidential Information, then Employee will compensate the Firm for the loss and damages suffered by the Firm by reason of lost engagement(s) by paying liquidated damages in an amount equal to the greater of -EITHER- (i) (A) one and one-half times the fees charged for such engagement(s) by the Firm for services performed by the Firm either (1) during the last full fiscal year or (2) the 12 month period prior to the last date upon which the Firm performed services for the client which the Firm loses as a result of such breach, whichever is greater, or (B) in the case of a prospective client or a prospective engagement, one and one-half times the amount of the proposed fee for the next 12 months of such lost engagement(s) -OR- (ii) one and one-half times the amount of the fee paid for such lost engagement(s) in the 12 month period following Employee's departure from the Firm. For purposes of this Paragraph 7(a), a prospective client is any person, company, partnership or other entity to which the Firm has made an oral or written proposal to perform services. Employee agrees to disclose in writing to his/her former Office Managing Partner or National Director, as applicable, within eighteen (18) months after the last date of Employee's employment with the Firm, all engagements involving accounting, auditing, tax or consulting services, or any related services performed within eighteen (18) months after his/her departure from the firm, whether performed by Employee by himself or herself, and/or through an entity with which he/she is or becomes associated, and/or which Employee arranged for such an entity to perform, which resulted, in whole or in part, from Employee's prior employment by the Firm.

(b)   If Employee, without the specific consent of the Chief Executive Officer, or his/her designee, solicits or otherwise causes another employee to leave the Firm through unfair competition or business practices or in violation of Employee's fiduciary duty, including the unauthorized use of Confidential Information, or to perform engagements involving accounting, auditing, tax and/or consulting services for any other firm, person or entity, then Employee will pay the Firm an amount equal to the total of (I) twenty-

five percent (25%) of the Annual Earnings of the departing employee, to cover the costs of replacing the departing employee; and (II) an additional ten percent (10%) of the departing employee's Annual Earnings for each year of service of the departing employee, up to a maximum of fifty percent (50%) of the departing employee's Annual Earnings, to cover training costs. For purposes of this Paragraph 7(b), the term "Annual Earnings" means the total dollars received as wages (excluding any bonus) by the departing employee during the twelve months preceding the last date of employment.

8.   In consideration of the Firm appointing Employee to a Manager position and/or for continued employment with the Firm in a Manager position, it is agreed that prior to, at, or after, his/her departure from the Firm (whether by resignation, termination or otherwise):

(a)  If Employee, without the specific consent of the Chief Executive Officer, or his/her designee, removes, copies, uses or discloses any Confidential Information, including any files, business records, trade secrets or other property of the Firm, in contravention of the Employee's obligations under this Agreement, then Employee will pay the Firm $20,000 for any such incident, loss or damage, or a lesser amount, if Employee reasonably proves to the Firm that such lesser amount fully compensates the Firm for the applicable loss or damage;

(b)  If Employee, without the specific consent of the Chief Executive Officer, or his/her designee, otherwise causes the Firm financial loss or damage through unfair competition or business practices or violation of Employee's fiduciary duty, including the unauthorized use of Confidential Information, then the Employee shall pay the Firm $20,000 for any such incident, loss or damage, or a lesser amount, if Employee reasonably proves to the Firm that such amount reflects the applicable loss or damage.

9.   It is agreed that Employee will pay to the Firm any amounts owing under paragraphs 7 or 8 with interest at the prime rate as charged from time to time by the principal bank(s) used by the Firm at such times, in five equal annual installments commencing thirty days from the date of notice from the Chief Executive Officer, or his/her designee, with succeeding payments to be made on the anniversary of such notice.  If Employee performs by himself/herself, or through an entity, or arranges for the performance of, services for a client or prospective client of the Firm, as set forth in paragraph 7(a) above, Employee agrees to maintain as confidential any Confidential Information known to Employee concerning such client, former client or prospective client in accordance with paragraphs 4 and 5 above.

10.  Notwithstanding anything contained in paragraphs 7 through 9 of this Agreement, it is agreed that any breach or threatened breach by the Employee of any of the covenants of paragraphs 7 or 8 may result in irreparable injury and damage to the Firm, which irreparable injury and damage shall not be adequately compensated in money damages, that the Firm shall have no adequate remedy at law for any such breach, and that, in addition to the Parties' agreements in paragraphs 7 and 8 as to amounts owing upon such breach by Employee, the Firm shall also be entitled to such equitable relief as may be necessary to protect it against any such breach or threatened breach, including, without limitation, injunctive relief.  It is further agreed that the Parties' agreements in paragraphs 7 and 8 as to amounts owing upon Employee's breach of any of the covenants of paragraph 7 or 8 are not intended to be in lieu of the injunctive relief in this paragraph and that it is fair and reasonable that the Firm be entitled to both remedies in the event of any one breach.

11.  (a)  Employee agrees to notify the Assurance Regional Technical Director for his/her office of any conversations, while employed by the Firm, with any of the Firm's attest clients regarding possible employment.  It is understood and agreed that this notice is required so that the Firm may take steps toward effectively eliminating the risk that, by reason of Employee's knowledge of and relationships with the Firm, Employee could adversely influence the quality or effectiveness of an engagement for which independence is required.

(b)  Notwithstanding the obligations set forth in paragraph 11(a), Employee further agrees that he/she will not take a position in a financial reporting oversight role (as defined in Rule 2-01(f)(3)(ii) of SEC Regulation S-X; such positions include, but are not limited to: a member of the board of directors, chief executive officer, chief financial officer, chief operating officer, chief accounting officer, controller,

director of internal audit, director of financial reporting, treasurer, or any equivalent position) at a publicly-held entity that is an audit client of the Firm at that time, if doing so would cause BDO to become not independent of that entity pursuant to Rule 2-01(c)(2)(iii) of SEC Regulation S-X. (This could occur if the employee was a member of the audit engagement team of that entity during the one (1) year period preceding the date that audit procedures commenced for the fiscal period that includes the date of initial employment of the Employee by the audit client, as proscribed by that rule. To comply with this rule, the entity must have filed with the SEC one annual report for a period subsequent to the period covered by the audit for which the Employee was a member of the audit engagement team.) This prohibition will remain in effect after the Employee has left the Firm (whether by resignation, termination, or otherwise) for the duration of the prohibited period. Employee agrees to discuss with the Assurance Regional Technical Director for his/her current or former BDO office any position that may come within the restriction of this subparagraph 11(b). It is understood and agreed that this restriction is required for BDO to comply with the rules of the Securities and Exchange Commission and that, should Employee fail to comply with this restriction and if this would cause BDO to become not independent, BDO would be prohibited from further providing attest services to such client and consequently would suffer significant and irreparable injury.

12. (a) Employee agrees to disclose fully to the Firm, and assigns and transfers to the Firm immediately upon origination or acquisition thereof, the right, title, and interest, together with all intellectual property rights which may be granted thereon, in and to any and all inventions, discoveries, improvements, innovations, copyrights, trademarks, trade secrets, and or designs ("Work Product") made, discovered, developed, or secured by Employee (whether solely, jointly with others or otherwise):

(i) during the period of his/her employment, if such Work Product is related, directly or indirectly, to the business of, or to the research or development work of the Firm; or

(ii) with the use of the time, materials, equipment, supplies or facilities of the Firm; or

(iii) within one (1) year after termination (whether by resignation, termination or otherwise) of Employee's employment, if such Work Product is conceived as a result of or is attributable to work done during such employment and relates to the Firm's business, its methods, products, processes, or procedures or is within the scope of the business or administration of the Firm.

Employee agrees that all Work Product shall be the exclusive property of the Firm, whether or not patent applications are filed thereon, and Employee shall perform all acts and execute, at the Firm's request and at no expense to Employee, any and all papers and instruments the Firm considers reasonably necessary to perfect and protect the Firm's rights, title and interest in and to the Work Product covered above under this paragraph.

(b) Paragraph 12(a) shall not apply to any of Employee's rights in any invention (1) for which no equipment, supplies, facilities or trade secret information of the Firm was used, and (2) that was developed entirely on Employee's own time unless (i) the invention relates (A) to the business of the Firm, or (B) to the Firm's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Firm.

(c) Employee acknowledges that he/she has carefully read these provisions and agrees that the restrictions and obligations set forth herein are fair and reasonable and are reasonably required for the protection of the interests of the Firm, its partners and employees.

13. (a) Employee agrees that the Firm may make reasonable use of Employee's name, portrait or photograph for advertising and trade purposes.

(b) Employee agrees that employment by and the compensation routinely received therefore from the Firm shall be full consideration and compensation for services performed by Employee and for the Work Product assigned by Employee to the Firm hereunder. Employee further understands that the amount and/or nature of compensation routinely received by Employee from the Firm may be changed from time to time without affecting any provision of this Agreement.

4

laws, the Firm may assign or otherwise transfer all of its rights and obligations of this Agreement, or any part of this Agreement, at any time in its sole discretion.

15.  This Agreement constitutes the entire agreement between the Parties hereto and cancels and supersedes, as of the date hereof, any and all other previous agreements between the Parties as to the subject matter of the Agreement.  The terms of this Agreement shall survive the departure of the Employee from the Firm and any change in Employee's position with the Firm, including election to partnership, except to the extent any such terms are rendered meaningless or expressly superseded by further written agreement(s) between Employee and the Firm.

16.  In the event any provision of this Agreement is found to be void, illegal or invalid for any reason whatsoever, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable.  In any event, the unenforceability or invalidity of any provision of this Agreement shall not affect any other provision of this Agreement, and this Agreement will continue in full force and effect, and be construed and enforced, as if such provision had not been included, had been deleted, or had been modified as above provided, as the case may be, it being the intention of the Parties that this Agreement be interpreted and construed so as to render it enforceable.

17.  It is agreed that any Firm dispute resolution procedure that may be or may become effective during the term of this Agreement shall in no way preclude or limit the right of the Employee or the Firm to seek any remedy available at law or in equity, and/or to file an action or suit in any court of competent jurisdiction with respect to any dispute arising under the provisions of Paragraphs 3 through 13 of this Agreement, subject to the limitations set forth in Paragraph 18 below.  It is further agreed that if any dispute arises between the Firm and the Employee with respect to any matter that is the subject of this Agreement, the Firm, upon prevailing in such dispute, shall be entitled to recover from the Employee all of the Firm's associated costs and expenses, including its reasonable attorneys' fees, in addition to any and all other available remedies.

18.  **Employee hereby agrees that the laws of the State of New York, excluding the conflicts of law provisions, shall apply to any action brought under this Agreement; agrees that venue for any action or suit brought under this Agreement will be in any federal or state court of competent jurisdiction in New York County, New York; and agrees to accept process in any such action.**

By Employee's signature below, Employee acknowledges that he/she has read, fully understands and agrees to the terms of this Agreement

EMPLOYEE

_____
Signature

Print Name:  Donald Sewell

Date  9/8/2015

Acknowledged and Agreed by:  _____

_____
Signature of Authorized Partner of the Firm
*ManagerAgr0515 (US)*

5

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BDO USA, LLP,                                           :

            Plaintiff,                            :          INDEX NO.

      v.                                               :

MATTHEW FRANZ AND DONALD SOWELL,    :          **SUMMONS**

           Defendants.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

To The Above-Named Defendants:

      **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorneys an

answer to the Complaint in this action within 20 days after the service of this Summons,

exclusive of the day of service, or within 30 days after service is complete if this Summons is not

personally delivered to you within the State of New York.  In case of your failure to appear or

answer, judgment may be taken against you by default for the relief demanded in the Complaint.

      Plaintiff designates New York County as the venue for this proceeding pursuant to

Sections 501 and 509 of the New York Civil Practice Law and Rules.


Dated: June 30, 2020                    Respectfully submitted,

                               **McDermott Will & Emery LLP**

                               By:    /s/ *Gregory G. Ballard*

                                    Gregory G. Ballard
                                    M. Elias Berman
                                    340 Madison Avenue
                                    New York, NY 10173
                                    Tel: (212) 547-5400
                                    Fax: (212) 547-5444
                                    gballard@mwe.com
                                    eberman@mwe.com

Michael Sheehan
444 West Lake Street
Suite 4000
Chicago, IL 60606
Tel: (312) 372-2000
Fax: (312) 984-7700
msheehan@mwe.com

*Attorneys for BDO USA, LLP*

TO:     DONALD SOWELL
        9135 FM 561
        De Kalb, Texas 75559

        MATTHEW FRANZ
        8712 Mariner Drive
        Raleigh, North Carolina 27615